**UNITED STATES of America,**

v.

**Jon Michael HARDER, Defendant.**

**Case No. 3:12–cr–485–SI**

United States District Court,
D. Oregon.

Signed November 17, 2015

Billy J. Williams, Acting United States Attorney, Allan M. Garten and Michelle Holman Kerin, Assistant United States Attorneys, 1000 S.W. Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for United States of America.

Christopher J. Schatz, Assistant Federal Public Defender, 101 S.W. Main Street, Suite 1700, Portland, OR 97204; Robert B.

Hamilton, Attorney at Law, 1001 S.W. Fifth Avenue, Suite 1100, Portland, OR 97204; Emily E. Elison, CASTLEBERRY & ELISON, P.C., 500 Yamhill Plaza Building, 815 S.W. Second Avenue, Portland, OR 97204. Of Attorneys for Defendant.

## SENTENCING MEMORANDUM AND ORDER

Michael H. Simon, District Judge.

In this criminal case, the Court is called upon to sentence Jon Michael Harder ("Harder" or "Defendant"), who pleaded guilty to one count of mail fraud and one count of engaging in an unlawful monetary transaction. These two counts carry statutory maximum sentences of 20 years and 10 years, respectively. The Government contends that Harder organized, managed, directed, and personally engaged in the largest investment fraud in the history of the District of Oregon. Harder served as the President, Chief Executive Officer, and majority owner of Sunwest Management, Inc. ("SMI") and its affiliated entities (collectively, "Sunwest").

The Court has concluded that at least from January 1, 2006, through July 7, 2008, Harder deceived, lied to, and misled more than 1,200 investors nationwide. Based on the Court's factual findings, the parties have agreed, for sentencing purposes, that Defendant's conduct caused actual losses that exceed $120 million. The parties also agree that a correct calculation of the applicable U.S. Sentencing Guidelines results in an advisory guideline sentence of life imprisonment. The statutory maximum sentence that may be imposed, however, is 30 years, assuming consecutive sentences for the two counts of conviction.

In their plea agreement, the Government agreed to recommend a sentence of not greater than 15 years, and the Defendant agreed to recommend a sentence of not less than five years. The parties have complied with this aspect of their plea agreement.

But that is not the end of the matter. A specific sentence within this range must be selected. As one court has explained:

> Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors.[1]

This is one of the most difficult decisions that a judge must make. The judge's decision likely will affect not only the criminal defendant, but also his or her family and the victims of the crime and their families. The sentence may also affect the future safety, security, and sense of well-being of the community.

We live under the rule of law, which directs that decisions are to be made under objective, common, and discernable legal principles and not the arbitrary decision of any individual government official. The discretion afforded a trial judge tests the limits of this principle. To some extent, sentencing is constrained by both substantive bounds (such as statutory minimum or maximum terms) and procedural bounds (such as mandated methodology and reasoning requirements).[2] Nevertheless, even within these bounds, there is often "more than one lawful solution,"[3] which provides both the legal basis for the court's discretion and the tension with the rule of law. In recognition of this tension,

---

1. U.S. District Judge Jed S. Rakoff, Sentencing Memorandum and Order at 1, *United States v. Gupta*, Case No. 11–cr–907 (S.D.N.Y. Nov. 9, 2012), ECF No. 127 (available on PACER).

2. *See* Sarah M.R. Cravens, *Judging Discretion: Contexts for Understanding the Role of Judgment*, 64 U. MIAMI L. REV. 947, 959 (2010)

3. Aharon Barak, JUDICIAL DISCRETION (Yale Univ. Press 1989), at ix.

it is incumbent upon a judge to explain the bases for a criminal sentence; others may agree or disagree with the sentence imposed, but a judge should leave no doubt about the factors that he or she has considered. This Sentencing Memorandum and Order sets forth the Court's reasoning for imposing the sentence that the Court has selected. The Court will both read this Sentencing Memorandum and Order in open court and docket it promptly thereafter in the electronic file for this case.

## BACKGROUND

On January 8, 2015, Jon Michael Harder, pleaded guilty to two counts of a 56–count amended indictment, alleging mail fraud, wire fraud, and unlawful monetary transactions in connection with the operation of Sunwest Management, Inc. ("SMI") and its affiliated businesses (collectively, "Sunwest" or the "Sunwest Enterprise"). The Court accepted Defendant's plea. As set forth in the plea agreement, the parties agreed that Defendant's sentencing should occur over two separate proceedings. In the first proceeding (Phase I), the Court determined: (1) whether Defendant's scheme to defraud exceeded the two counts of conviction (*i.e.*, the two counts to which Defendant pleaded guilty); and (2) all "relevant conduct" related to Defendant's scheme to defraud. In the second proceeding (Phase II), the Court will determines and imposes an appropriate sentence, considering the applicable advisory sentencing guidelines and all other sentencing factors set forth in 18 U.S.C. § 3553(a).

The Phase I sentencing proceeding began on May 12, 2015. Both sides total submitted hundreds of pages of memoranda before the hearing began, the Government called 14 witnesses and offered more than 200 exhibits, and the Defense counsel called seven witnesses, including Defendant, and offered more than 400 exhibits.

On May 28, 2015, the parties presented closing argument lasting approximately five hours. On July 20, 2015, the Court issued its Findings of Fact and Conclusions of Law at Phase I of Defendant's Sentencing Proceeding. The Court concluded that the scope of Defendant's scheme to defraud exceeds the two counts of conviction and that the relevant conduct includes all Sunwest senior-housing-facility and senior-housing-development investments sold by Defendant, directly or indirectly by persons acting under his control, supervision, or direction, to investors from January 1, 2006, through July 7, 2008, regardless of the specific form of those investments. Defendant filed objections to the Court's findings and conclusions. Although several of Defendant's objections were well taken, they were insufficient to change the result. On November 4, 2015, the Court issued Amended Findings of Fact and Conclusions of Law at Phase I of Defendant's Sentencing Proceeding, reaching the same conclusions. *United States v. Harder,* 2015 WL 6756119, at *1 (D.Or. Nov. 4, 2015) ("Amended Opinion at Phase I"). The underlying facts are set forth in detail in the Court's Amended Opinion at Phase I.

The Phase II sentencing proceeding began on November 16, 2015, and lasted two days. In addition to the Court receiving extensive memoranda and hearing argument from counsel, the Government called eight witnesses and presented written and oral statements from numerous victims. The Defense called five witnesses and presented numerous letters on behalf of Defendant, who exercised his right of allocution.

## U.S. ADVISORY SENTENCING GUIDELINES CALCULATION

For purposes of calculating the applicable sentencing guideline, incorporating the

U.S. Sentencing Guidelines ("USSG") as amended effective November 1, 2015, the parties agree to all but two of the relevant offense level factors. With regard to the offense level, the parties agree as follows:

| | |
|---|---:|
| Base (USSG § 2B1.1(a)(1) | 7 |
| Loss: More than $65 million; less than $150 million (USSG § 2B1.1(b)(1)(M) | 24 |
| More than 25 victims with significant financial hardship (USSG § 2B1.1(b)(2)(C) | 6 |
| Sophisticated means (USSG § 2B1.1(b)(10)(C) | 2 |
| Securities law violation (USSG § 2B1.1(b)(19)(A) | 4 |
| Money laundering (USSG § 2S1.1(b)(2)(A) | 1 |
| Vulnerable victims (USSG § 3A1.1(b)(1) | 2 |
| **Sub-total:** | **46** |

The parties disagree over whether two additional points should be added to the offense level based on what the Government contends are Defendant's additional misrepresentations made to the U.S. Bankruptcy Court. Pursuant to USSG § 2B1.1(b)(9)(B), misrepresentations made to a bankruptcy court warrant adding two points to the offense level. The parties also disagree over whether the Defendant, who pleaded guilty to two counts, should receive the benefit of a two-point reduction for "acceptance of responsibility" under USSG § 3E1.1.

The Court does not need to resolve these two remaining disagreements because their resolution would have no practical effect on the ultimate guidelines calculation. Under the guidelines:

In rare cases, a total offense level of . . . more than 43 may result from application of the guidelines. . . . An offense level of more than 43 is to be treated as an offense level of 43.

USSG, Chapter 5, Part A, Application Note 2. Thus, an offense level of 46 is to be treated as an offense level of 43. Even if the Court were to agree with the Government that an additional two points should be added for "bankruptcy misrepresentation," the offense level may not exceed 43. Similarly, even if the Court were to agree with Defendant that a two-point reduction would be appropriate for "acceptance of responsibility," the offense level would be reduced, at most, to 44 (assuming no points were added for bankruptcy misrepresentation), which still must be treated as an offense level of 43. Thus, the Court concludes that Defendant's offense level is 43.

The parties agree, and the U.S. Probation Office confirms, that Defendant has no prior criminal history. Thus, Defendant is at a Criminal History Category of I. Under the U.S. Sentencing Guidelines, an offense level of 43 results in an advisory guidelines sentence of life imprisonment, regardless of criminal history.

Finally, an additional guidelines provision must be considered because the statutory maximum sentence for mail fraud in violation of 18 U.S.C. § 1341 is 20 years imprisonment and the statutory maximum sentence for engaging in unlawful monetary transactions in violation of 18 U.S.C.

§ 1957 is 10 years imprisonment. According to the sentencing guidelines,

> If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects, sentences on all counts shall run concurrently, except to the extent otherwise required by law.

USSG § 5G1.2(d). Because the advisory guidelines sentence is life imprisonment, which exceeds the statutory maximums for both offenses combined, the guidelines sentence would be 20 years on the first count of conviction followed by 10 years on the second count of conviction, to run consecutively, for a total of 30 years' imprisonment. Consistent with the parties' plea agreement, however, the Government recommends a total sentence of 15 years and the Defendant recommends a total sentence of 5 years.

## SENTENCING FACTORS TO BE CONSIDERED UNDER FEDERAL LAW

Congress has stated that, in addition to calculating and considering the U.S. advisory sentencing guidelines, a federal court must consider the following in imposing a sentence:

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(1), (2). The Court has considered all of these factors, even though I may only mention several in these comments.

## APPLICATION OF SENTENCING FACTORS

### A. Overview of the Specific Fraudulent Scheme

■ As more fully described in the Court's Phase I Amended Findings and Conclusions, the Court finds that Jon Michael Harder knowingly and intentionally misled numerous investors, including tenant-in-common (or TIC) investors, about the nature and risks of their investments in Sunwest senior housing facilities and senior housing development projects. The types of misrepresentations, half-truths, and material omissions made by Harder and those acting under his direction are also more fully described in the Court's Phase I Amended Findings and Conclusions, but two in particular stand out. First, Harder failed to inform investors that Sunwest senior housing facilities and development projects lend money to, or commingle funds with, numerous other Sunwest senior-housing facilities as well as other Harder-related non-senior housing projects to pay expenses, including rent payments, for those other facilities and projects. Indeed, Harder and those working under his control actively misled investors to believe the contrary by stating that the investors were investing in single-pur-

pose entities and that the success or failure of each facility or development deal would rise or fall on its own merits. In this way, Harder was able to obtain multiple investments in different properties from the same investor sometimes by stating or implying that the investor would gain the benefits of diversification through investing in several different Sunwest properties.

Second, Harder failed to inform investors that the entire Sunwest enterprise, as a whole, had been and remained operating at substantial monthly losses. Indeed, Harder and those working under his control actively led investors to believe the contrary by stating that Sunwest had never missed a rent payment owed to any investor in any Sunwest facility, thereby implying that the enterprise had achieved wide success. Although such a statement that no rent payments had ever been missed may have been literally true, the statement was materially misleading and, thus, fraudulent, because Harder failed to disclose the full story. Harder and others working under his control failed to disclose the ever-growing and substantial monthly losses experienced by Sunwest on an enterprise level. Further, Harder and others working under his control failed to explain that the reason why no rent payments had ever been missed was because, when needed, money to make rent payments would be taken, or "borrowed,"

from other facilities in what Sunwest's former chief financial officer described as "the daily hunt for cash." As matters grew more dire, Sunwest kept locating new properties and closing on new property acquisitions so that Sunwest could use some of the money obtained from new acquisitions (including new investor money and new loan proceeds) to pay mounting expenses relating to previously-acquired facilities. In this respect, Sunwest had features that resembled a "Ponzi scheme," even if it was not a Ponzi scheme in a literal or technical sense.[4]

## B. Nature and Circumstances of the Offense and History and Characteristics of the Defendant

For purposes of sentencing, the parties have stipulated that the losses caused by Defendant's relevant conduct, as found by the Court, exceed $120 million. In some economic crimes, including some types of securities or investment fraud or insider trading, courts and academic writers frame the harm as committed "on the market" or against some faceless, nameless set of market participants. Such framing is not, however, the situation in this case. In the Sunwest fraud, there are more than 1,200 investors who have names, faces, and who have suffered, in some cases tragic, life-altering injuries caused by having their hard-earned life savings taken away from them. Indeed, many of the victims are at

---

4. Different courts have applied different definitions of "Ponzi scheme." *See In re Taneja*, 2012 WL 3073175 (Bankr.E.D.Va. July 30, 2012) (discussing varying definitions of "Ponzi scheme"); *In re Rose*, 425 B.R. 145, 152 (Bankr.M.D.Pa.2010) ("One of the struggles in this case has been to find a clear definition of the term 'Ponzi scheme.' "). The meaning of the term is further clouded by its modern colloquial usage to describe financial arrangements that are allegedly unsustainable or unlawful. *See* Alex Tabarrok, *Is Social Security a Ponzi Scheme?*, Marginal Revolution, Sept. 10, 2011 (noting that at least three Nobel

Prize winners have publicly compared Social Security to a Ponzi scheme); Paul Krugman, *The Ponzi Thing*, N.Y. Times, Sept. 14, 2011 (article by Nobel Prize winner, noting that Social Security "is nothing at all like a classic Ponzi scheme"). The primary disagreement among legal definitions of the term appears to involve whether, in a true Ponzi scheme, the underlying business venture was inherently fraudulent or merely unsustainable. *See In re Taneja*, 2012 WL 3073175, at *5–8. For present purposes, however, it is sufficient to note that "[a]ll Ponzi schemes are frauds. Not all frauds are Ponzi schemes." *Id.* at *7.

or near retirement age, and a not insignificant number have had to forgo retirement, return to work from requirement, or have otherwise have had drastically to alter their life style. Thus, wholly apart from the dollar value of the loss caused by Harder's fraud, the victim impact to specific, identifiable investor victims ranges from moderate to high.

In addition, although the investors are the direct victims of Defendant's crime, they are not the only victims. Sunwest's business model was to purchase an assisted living facility at a discounted price because that facility was "under-performing." Under this model, Sunwest would then invest new resources to improve the newly-acquired facility, improve occupancy rates, and then sell the facility at a profit (or re-finance it), thus providing investors with all that they had been promised. Because of Sunwest's diversion of funds and other commingling used to support Harder's lifestyle, funding of non-senior-living-facility projects that benefitted primarily Harder (and other Sunwest insiders, but not Sunwest's other investors), and payment of the more urgent expenses relating to other senior living facilities, oftentimes money was not available to refurbish, improve, or even meet the necessary expenses of the newly-acquired senior-living facility. Thus, the newly-acquired facility would not be improved as promised. This failure not only hurt the investors in that facility, it also placed at risk the senior citizens who were living in that facility. In Phase I, the Court heard evidence about senior living facilities under Sunwest's management needing repair or going without having their bills timely paid. All of this contributes to the harm caused by Defendant's fraud.

In addition, as stated, Harder served as the President and Chief Executive Officer of Sunwest. Testimony was presented at Phase I that Harder was firmly in control of all material decisions and was fully aware of all material facts. This case, thus, is distinguishable from a corporate fraud in which the president or chief executive officer may have been unaware of the fraudulent details of what underlings were doing. It is also distinguishable from a corporate fraud in which a mid-level manager defendant was simply carrying out the orders of his or her employer.

In addition, this was not a one-time, or single event, deception. The fraudulent scheme was both sophisticated and lasted at least several years in duration. It was repeated over and over with new investors at least from early 2006 through mid–2008. Moreover, Harder knew of the wrongfulness of commingling funds and engaging in inter-facility lending without providing adequate discloses since at least March 31, 2004, when U.S. District Judge Michael Mosman entered his decision in the civil case of *Kraus v. Harder,* 2004 WL 716576, at *6 (D.Or. March 31, 2004). Although Harder argues that he relied on sophisticated legal counsel to ensure that he complied with all laws, there was no evidence presented that any attorney ever advised Harder to mislead or deceive investors. Moreover, as described more fully in the Phase I Amended Findings and Conclusions, only a small core group within Sunwest really understood the magnitude of the fraudulent scheme.

The Court recognizes that Harder has no criminal record and that a number of family and friends speak well of him and of the positive and charitable deeds that he has performed over his adult lifetime. The Court also recognizes that after Sunwest could no longer function as normal in July 2008 and the fraudulent scheme had been exposed, Harder cooperated with the Chief Restructuring Officer and with the Court and mediator and others in the related civil lawsuit brought by the Securities Exchange Commission and that with-

out Harder's cooperation it would have taken more time and more expense for the investors to recover what they have been able to recover. Without Harder's cooperation, the actual losses would likely have been greater and the recovery would have been further delayed. The Court must take all of this into consideration in sentencing, and the Court has done so.

## C. Additional Factors

■ For all of the reasons previously discussed, the Court considers the offense to be quite serious, and the Court must find a sentence that will promote respect for the law, provide just punishment, and afford adequate deterrence, both specific and general deterrence. With regard to the concept of "just punishment," it is fair to conclude that the punishment must fit the crime; that includes an assessment of the harm caused and the intentionality of the defendant. In addition, to some extent, punishment, as an appeal to retribution, may help some victims in their healing process.

■ With regard to the concept of deterrence, the Court must consider both the specific deterrence of the defendant before the Court and the deterrence of other people who may be inclined to commit similar crimes. Given the publicity surrounding the Sunwest fraudulent scheme, it is unlikely that Defendant will be placed in a position of trust again in the future, so the need for specific deterrence is somewhat mitigated. I will now address general deterrence.

"[D]eterrence occurs where a potential offender will commit a crime only if the benefits exceed the expected sanction."[5]

"The greater the perceived certainty, severity, and swiftness of punishment, the lower the crime rate will be."[6] The social sciences, however, need to do more work to better understand how to deter crime and how much of a sentence is needed to achieve a desired level of deterrence.

It is also very difficult to predict deterrence because different thought processes are at play in motivating crime. Mr. Harder is an intelligent man. I believe that he understood that he was deceiving and misleading people. But I also believe that he did not want anyone to lose their investment. He is not Bernie Madoff. He really believed that he and his investors would all succeed, and perhaps that is how he justified his deceptive conduct in his own mind: No harm; no foul.[7] But the 2007 worldwide financial crisis came, unanticipated by most people. And when it arrived, it exposed all of the risky investments—and then some. There is nothing wrong with making a risky investment with one's own money. But there is something wrong with lying to and misleading other people about an investment being safe when it is in fact quite risky. More than that, as the risks became clearer and clearer to Mr. Harder in 2007 and the first half of 2008, he continued lying to and misleading people, taking in new investments while also engaging in the "daily hunt for cash." Also of this resulted in losses of at least $120 million. That is a serious crime. The "message in the sentence to society that the court views this violation as serious enough that it ought to be deterred"[8] is the message that the Court seeks to communicate in this sentence.

**5.** Peter J. Henning, *Is Deterrence Relevant in Sentencing White–Collar Defendants?*, 61 WAYNE L. REV. 27, 40 (2015).

**6.** *Id.* at 41 (quotation marks and citation omitted).

**7.** *See generally* Todd Haugh, *Sentencing the Why of White Collar Crime*, 82 FORDHAM L. REV. 3134 (2014).

**8.** *Id.* at 58.

Finally, the Court must attempt to avoid unwarranted sentence disparities among defendants with similar criminal records who have been found guilty of similar conduct. It is extremely to compare "similar conduct" when dealing with different cases and different factual situations. Nevertheless, the Court has attempted to do this.

## CONCLUSION

After carefully weighing all of these, and other, relevant factors, the Court concludes that the sentence that most fulfills all of the requirements of Section 3553(a) and that is sufficient but not greater than necessary to achieve the sentencing objectives directed by Congress is 15 years in prison. Therefore, Jon Michael Harder is sentenced to 180 months' imprisonment on Count 13 (the first count of conviction) and 120 months' imprisonment on Count 51 (the second count of conviction), to be served concurrently, followed by three years of supervised release on the terms stated from the bench and hereby incorporated by reference. All remaining counts are dismissed on the motion of the Government. The Court will defer the determination of restitution for up to 90 days, as permitted by federal law. A Judgement embodying these terms and incorporating this Sentencing Memorandum and Order by reference will issue shortly.

The Court views Defendant as suitable for voluntary surrender. Defendant is hereby ordered to report to an institution to be determined by the Federal Bureau of Prisons not later than 2:00 p.m. on Thursday, February 25, 2016. Defendant is further ordered to report to the U.S. Marshals Service immediately after sentencing for further instructions.

**IT IS SO ORDERED.**